

August 24, 2020

**VIA ECF**
Hon. Edgardo Ramos
United States District Judge
United States District Court
Southern District of New York
40 Foley Square, Courtroom 619
New York, NY 10007

   Re: Dector, et al. v. RCI PLBG, Inc., et al.,
      Case No. 17-CV-2269 (ER)

Dear Your Honor:

  This firm is counsel to Plaintiffs in the above-referenced action. I respectfully submit this letter motion on behalf of all Parties for approval of the Parties' negotiated Settlement Agreement and Release (the "Settlement Agreement") herein attached as Exhibit A. For the reasons set forth below, the Parties respectfully request that the Settlement Agreement be approved pursuant to the Second Circuit's decision in Cheeks v. Freeport Pancake House, Inc., 796 F.3d 199 (2d Cir. 2015) and be found to be fair and reasonable in accordance with the factors set forth in Wolinsky v. Scholastic Inc., 900 F. Supp. 2d 332, 335-336 (S.D.N.Y. 2012).

  **I.** **Procedural History**

  This action was originally brought by Plaintiffs Alvaro Dector and Wilson Romero ("Named Plaintiffs") on March 29, 2017, individually and on behalf of all others similarly situated, for alleged failure to pay minimum wages, overtime wages, and failure to provide paystubs pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. 201 et seq., and the New York Labor Law ("NYLL"). On June 30, 2017, this matter was referred to the pilot mediation program for the Southern District for all cases involving FLSA matters in your docket.

  As colleagues of the Named Plaintiffs alleged similar allegations against Defendants, the Parties negotiated and stipulated to a conditional FLSA collective certification, which was So Ordered by Your Honor on December 4, 2017. (See Dkt. No. 36) Pursuant to this Order, Defendants provided Plaintiffs' counsel with contact information for "employees who performed work as a plumber, mechanic or laborer for RCI PLBG, Inc. at any time between October 4, 2014" and the date of issuance. Such potential plaintiffs were mailed a Notice of Pendency for the lawsuit, along with a Consent to Sue form, both approved by the Court. In accordance with the established procedures, one hundred eleven (111) of the approximately three hundred (300) potential plaintiffs chose to Opt In to this lawsuit.



The Opt In statements were thereafter filed with the Court over the next several months, after which the Parties then worked to exchange and evaluate discovery materials for such individuals.  While the initial mediation (before mediator Pamela Esterman, Esq.  of Sive, Paget & Riesel, P.C.) was originally set for June 2018, the production of discovery materials, followed by conflicting scheduling concerns of the Parties resulted in said mediation conference ultimately being held on November 19, 2018.

While the November 2018 mediation conference did not result in a settlement, the parties continued to work in earnest under the supervision of Mediator Esterman and agreed to continue good faith negotiations.  With the assistance of Mediator Esterman, the Parties significantly moved closer as they evaluated their respective positions.  A second in-person mediation session was held on June 13, 2019, wherein the Parties agreed in principle on substantive terms and executed a term sheet.  The proposed agreement included an 18-month payout term which would accommodate Defendants' ability to pay in full by March 2021.  Although the Parties were in general agreement as to what the monetary liability of Defendants would be assuming that the Plaintiffs were able to prevail on their wage and hour claims, since all Plaintiffs had not been deposed, the Parties agreed it would be prudent to confirm individual Opt-In Plaintiffs' calculation of damages. [1]   While this confirmation process, together with delays caused by, among other things, the Covid-19 pandemic, may have delayed the finalization of the Settlement Agreement, it did not significantly alter the payment schedule agreed to at the June 2019 mediation.  The Settlement Agreement now provides for a 16-month payment schedule with final installment payment date of June 15, 2021.

---

[1] The vast majority of Opt-In Plaintiffs were in agreement with the time records produced by Defendants, although there were some discrepancies which needed to be accounted for prior to finalizing a distribution schedule.  While the parties agree that the settlement amount provides for payment of all base wages and overtime that would be owed were Plaintiffs to prevail, plus a $250.00 payment for Wage Theft Prevention Act violations per Opt-In plaintiff (both amounts after attorneys' fees and costs have been accounted for), they have agreed to use a settlement administrator to further verify such amounts prior to final distribution of payments.  It is anticipated that of the settlement amount, approximately $28,000.00 is to compensate for WTPA violations and approximately $225,000.00 for wage and overtime amounts owed.  The agreement provides for as much as $90,000 (or approximately 40% of the base wage and overtime amounts owed) as a "holdback fund" to be allocated towards liquidated damages.  (In addition to the approximately $70,000.00 initial sum set aside for the holdback fund, it is Plaintiffs Counsel's expectation that the $25,000.00 set aside for the claims administrator will not be fully utilized, with the remainder to be added to the holdback fund. See footnote 2 below.  Additionally, should any Plaintiffs choose to opt-out of the settlement, up to an additional $20,000 will be available for the holdback fund.)  Upon verification of such base wage and overtime amounts by the settlement administrator, the holdback fund will be distributed to Plaintiffs pro rata based on their respective adjusted base wage and overtime amounts owed.



## II.     Plaintiffs' Allegations and Defendants' Responses

Plaintiffs consist of 113 "[c]urrent and former employees of RCI PLBG, Inc. who, during the applicable FLSA limitations period, performed any work as a plumber, mechanic or laborer for RCI PLBG, Inc. and who [gave] consent to file a claim to recover damages for overtime compensation that is allegedly due to them for time worked in excess of forty hours per week." (See Dkt. No. 36, Conditional FLSA Collective Certification Order). Plaintiffs allege that they worked greater than forty (40) hours per week, and were paid "straight time" hourly wages for any of these overtime hours. Specifically, Plaintiffs allege that they were paid a lump sum for such overtime hours that was equivalent to the number of hours worked multiplied by their base hourly wage. Furthermore, where Plaintiffs worked greater than 40 hours per week, they allege that wage statements were deficient by failing to indicate the number of hours worked nor did such statements indicate the amount of wages to be allocated for overtime payments.

Defendants deny the allegations asserted by Plaintiffs, and specifically deny any potential liability. Among other matters, Defendants dispute both Plaintiffs' claimed days and hours worked, and Plaintiffs' calculation of purported damages. Notwithstanding the foregoing, Defendants agreed that allowing for notice to be provided to potential Opt-In plaintiffs would permit for adjudicating other employees' potential claims in an efficient and practical manner.

In sum, there is a bona fide dispute between the Parties regarding the merits of Plaintiffs' wage and hour claims. The instant settlement constitutes the Parties' effort to resolve same in an amicable fashion through arm's length bargaining. Furthermore, it should be expressly noted that Defendants deny any liability whatsoever, and that this settlement shall not be construed as an admission of guilt or liability.

## III.    Settlement Amount

The Parties have agreed to a gross settlement amount of $550,000.00, inclusive of Plaintiffs' counsel's fees and costs. This settlement amount is well within the range of reasonableness for an FLSA settlement. Upon review of Defendants' time and payroll records, Plaintiffs calculated the alleged unpaid wage and overtime wages to be $210,297.51. After confirming these calculations post-mediation with approximately 80% of Opt-In Plaintiffs, and when factoring discrepancies raised by said Plaintiffs, which for purposes of settlement only are not disputed by Defendants, the amount of wages allegedly owed is calculated to be $228,269.87. A spreadsheet showing hours worked and amounts owed is attached hereto as Exhibit B.

Defendants' calculations based upon the same time and payroll records revealed a significantly lower amount of wages that would be owed were Plaintiffs to prevail on their claims. Specifically, Defendants calculated that Plaintiffs would be entitled to $116,957.13 in total wages were they to prevail at trial. This is substantially less than the $228,269.87 calculated by Plaintiffs'



Counsel. Attached as Exhibit C is a copy of Defendants' calculations summary for all Plaintiffs, together with the supporting individual calculations for three separate Plaintiffs.

The Settlement Agreement allocates $250.00 per Opt-In Plaintiff to compensate for alleged WTPA violations, which amounts to $28,250.00 for all Opt-In Plaintiffs. The Parties have allocated $5,275.68 to reimburse costs incurred by Plaintiffs' Counsel and a one-third attorneys fee of $183,333.33 (see Section III.E below). Additionally, the Parties shall set aside $25,000.00 of the settlement amount in escrow to pay for a Settlement Administrator to confirm settlement calculations, verify contact information of Opt-In Plaintiffs, track the release paperwork (and Opt-Out Statements, as discussed below, should they be submitted) provided by individual Opt-In Plaintiffs[2], and perform other services as may be necessary to effectuate this settlement.

Finally, there shall be an estimated $70,000 to be allocated for liquidated damages, or approximately 40% of the amount of alleged base overtime wages based on Plaintiffs' calculations. (Based on Defendants' calculations, said amount is substantially greater.) The precise amount to be allocated for liquidated damages shall be determined after any remedial adjustments are made to the base awards (as confirmed by the Settlement Administrator and agreed to by the Defendants upon presentment of "competent and compelling evidence" by Opt-In Plaintiffs). (See Paragraph 4(b) of Settlement Agreement). Additionally, the liquidated damages amount shall likely be increased by (a) a substantial portion of the $25,000.00 held in escrow for the expense of Settlement Administrator, as such full escrow amount is unlikely to be exhausted, and (b) an additional $20,000.00 to be added to the holdback amount pursuant to Section 4(e) of the Settlement Agreement, in the event that some Plaintiffs do not submit releases in accordance with the procedures set forth in the Settlement Agreement. All of the liquidated damages amount shall be distributed to Opt-In Plaintiffs pro rata based on their respective adjusted base wage and overtime amounts allegedly owed them.

This gross settlement amount reflects a reasonable compromise between the Parties' dispute with Defendants over the alleged failure to pay minimum wages and overtime wages, and the alleged failure to provide accurate paystubs.

## IV.     The Settlement Agreement is Fair and Reasonable

Plaintiffs seek final approval of the Settlement Agreement reached in this case, pursuant to the Second Circuit's decision in Cheeks v. Freeport Pancake House, Inc., 796 F.3d 199 (2d Cir. 2015) (holding, "the FLSA falls within the 'applicable federal statute' exception under Rule 41" and therefore, "Rule 41(a)(1)(A)(ii) stipulated dismissals settling FLSA claims with prejudice

---

[2] Pursuant to negotiations, Defendants will bear the cost of the mailing of all individual payments and tax documentation, and as such the Parties expect the amount to be paid to the Settlement Administrator to be substantially less than $25,000.00.



require the approval of the district court or the DOL to take effect."). As set forth below in further detail, and in accordance with Wolinksy v. Scholastic Inc., 900 F. Supp. 2d 332 (S.D.N.Y. 2012), the Parties are in agreement that this settlement is fair, reasonable, consistent with the underlying purposes of the FLSA, and is the product of equal bargaining.

As articulated in Wolinksy, when assessing the fairness of a settlement, a court should consider the totality of circumstances including but not limited to several factors such as: (1) the range of possible recovery; (2) the extent to which "the settlement will enable the parties to avoid anticipated burdens and expenses in establishing their respective claims and defenses"; (3) the seriousness of the litigation risks faced by the parties; (4) whether the settlement agreement "is the product of arm's-length bargaining between experienced counsel"; and (5) the possibility of fraud or collusion. Wolinksy, 900 F. Supp. 2d at 335 (quoting Medley v. Am. Cancer Soc., No. 10 Civ. 3214, 2010 U.S. Dist. LEXIS 75098 (S.D.N.Y. July 23, 2010)). Based on an analysis of these factors, the Parties are confident that the negotiation process was conducted at arm's length and that the within settlement and its terms will be acceptable to this Court.

### A. The Range of Possible Recovery

Based on damage calculations prepared by Plaintiffs' counsel and relying on Plaintiffs' allegations, Plaintiffs contend that they are owed $228,269.87 in back wages, exclusive of statutory penalties, liquidated damages and attorney's fees. The potential damages owed for WTPA violations, at $5,000.00 per Plaintiff for the 111 Opt-In Plaintiffs, amounts to $555,000.00. These calculations, however, do not factor defenses asserted in the litigation and the inherent risks and uncertainties of a jury trial. Notwithstanding, after formal discovery production and extensive settlement discussions, the Parties were able to negotiate a Settlement Agreement for and amount that shall pay Opt-In Plaintiffs all base amounts allegedly owed, plus a payment of $250.00 per plaintiff ($28,250.00 in total) for alleged WTPA violations, plus liquidated damages of as much as 40%. Notably, these amounts are exclusive of attorneys' fees and costs.

### B. The Seriousness of the Litigation Risks Faced by the Parties

Considering the risks and the uncertainty of trial, Plaintiffs' counsel believes that this settlement is a fair result and should thus be approved.   See e.g. Meigel v. Flowers of the World, NYC, Inc., 2012 U.S. Dist. LEXIS 2359, at *2-3, 11 Civ. 465 (KBF) (S.D.N.Y. Jan. 9, 2012) ("Typically, courts regard the adversarial nature of a litigated FLSA case to be an adequate indicator of the fairness of the settlement. If the proposed settlement reflects a reasonable compromise over contested issues, the court should approve the settlement.") (internal citations omitted). In addition, the cost of the Settlement Amount is substantially less than the anticipated costs of trial. By settling now rather than litigating further, Plaintiffs avoid the risk of losing at trial, in whole or in part, or, even if prevailing at trial, avoid the inability to collect due to the financial hardship claimed by Defendants. It must be stated that Defendants are exposed to

additional significant liabilities, including, without limitation, other litigation and weathering the Covid-19 crisis.

Continued litigation therefore will negatively impact and/or impair Plaintiffs' chances of any or greater recovery. Most importantly, the Named Plaintiffs understand the risks, benefits and alternatives, and are satisfied with the settlement amount and terms of settlement, and voluntarily and willingly entered into the Settlement Agreement. Furthermore, the Settlement Agreement provides for any Opt-In Plaintiffs who so desires to Opt-Out and pursue litigation rights on an individual action, while benefiting from a tolling provision which would allow him/her to recover damages based on the filing of the Opt-In Statement. [3]

### C. The Settlement Negotiations Occurred at Arm's Length

From the onset of this case the Parties engaged in good faith communications and discussions in an effort to settle this matter. Defendants represented that Plaintiffs were paid for all hours worked and that they were supplied with all required notices and documents. Defendants also provided payroll and time records for the 111 Opt-In Plaintiffs. Although, a small number of Plaintiffs questioned the completeness of these records, the Parties recognize and accept the business risks of further extended and prolonged litigation and the possible difficulty of collecting a judgment. As such, the Parties, through arm's length negotiations, were able to settle prior to a trial.

### D. The Proposed Settlement Does Not Conflict with the Cheeks Admonitions

The settlement agreement does not contain any terms that would prevent the Court's approval. See Nieto v. Izzo Construction Corp., No. 15 Civ. 6958, 2018 WL 2227989, at *2 (E.D.N.Y. May 14, 2018) (Levy, Mag.). For instance, the agreement does not contain a confidentiality or non-disparagement clause that may "run afoul of the purposes of the FLSA and the public's independent interest in assuring that employees' wages are fair." Flood v. Carlson Restaurants Inc., No. 14 CIV. 2740 AT GWG, 2015 WL 4111668, at *1 (S.D.N.Y. July 6, 2015) (citing Lopez v. Nights of Cabiria, LLC, No. 14 Civ. 1274, 2015 WL 1455689, at *5 (S.D.N.Y. Mar. 30, 2015)); also compare Ezpino v. CDL Underground Specialists, Inc., No. 14CV3173DRHSIL, 2017 WL 3037483, at *2-3 (E.D.N.Y. June 30, 2017), report and recommendation adopted, No. CV143173DRHSIL, 2017 WL 3037406 (E.D.N.Y. July 17, 2017) (citing Cheeks, 796 F.3d at 206) (approving settlement agreement where it did not "contain a confidentiality provision nor does it contain a non-disparagement clause"); with Gonzalez, 2015 WL 6550560, at *3 (citing Cheeks, 796 F.3d at 206) (declining to approve FLSA settlement containing a confidentiality provision).

---

[3] Should any Plaintiffs opt-out, then Defendants would receive a credit equivalent to the amount allocated for such plaintiffs' damages in their calculations provided.

**SLATER SLATER SCHULMAN LLP**
ATTORNEYS AT LAW

Other factors present do not weigh against approval of the settlement. This matter was conditionally certified as a collective action, but Opt-In Plaintiffs retain the ability to opt out of the settlement without prejudice, and, as mentioned above, should any choose to do so they would benefit from the tolling provisions provided in the Settlement Agreement. Thus, the settlement of this action will not negatively impact any other employees or their rights. Additionally, this case presents no novel questions of law that would benefit from extensive litigation.

E. **Plaintiffs' Counsel Is Entitled to Reasonable Attorney's Fees and Costs**

The Settlement Agreement also provides for reasonable attorney's fees. Pursuant to our Firm's agreement with the Plaintiffs, the firm will be reimbursed $5,275.68 in filing fees/costs, and retain 1/3 of the settlement amount of $183,333.33.

Attorneys' fees of one-third on FLSA and NYLL claims are routinely approved by courts in the Second Circuit. See, e.g., Calle v. Elite Specialty Coatings Plus, Inc., 2014 U.S. Dist. LEXIS 164069 (E.D.N.Y. Nov. 19, 2014) (approving settlement of FLSA and NYLL claims stating that a "one-third contingency fee is a commonly accepted fee in this Circuit"); Rangel v. 639 Grand St. Meat & Produce Corp., 2013 U.S. Dist. LEXIS 134207 (E.D.N.Y. Sept. 19, 2013). This case is distinguishable from the case cited in Cheeks, wherein that settlement agreement was denied because the attorneys' fees were set at between 40 and 43.6 percent of the total payment, without justification to support the higher fees. Cheeks, 796 F3d at 206 (citing Lopez v Nights of Cabiria, LLC, 96 F Supp 3d 170, 181-82 (SDNY 2015).

Furthermore, the extended payout (through June 2021) obviously brings the risk of default and non-payment by Defendants, especially in light of the current pandemic and economic environment. This is a risk that Plaintiffs' Counsel, receiving payment in installments together with the Opt-In Plaintiffs, will share accordingly. Therefore, as 1/3 attorneys' fees are standard practice in FLSA claims, it is a fair number for this matter as well.

Slater Slater Schulman LLP represents both plaintiffs and defendants in litigating claims arising out of the employment relationship, including claims for employment discrimination, wage and hour issues, and contract disputes. The main attorneys working on this matter include:

Jonathan E. Schulman, Esq., partner of Slater Slater Schulman LLP, has over 16 years of experience in the field of corporate and/or employment law. He graduated with a Juris Doctor Degree from the University of Pennsylvania Law School in 2003. His office currently represents plaintiffs with wage & hour claims in two recently settled class actions in the Southern District of New York representing more than 1300 plaintiffs, securing settlement amounts of over $18 million for his clients. Prior to forming Slater Slater Schulman LLP, Mr. Schulman practiced law at Jones Day in Singapore and Schulte Roth & Zabel LLP. Slater Slater Schulman LLP focuses on



employment law. Given his years of experience, and the practice's specialized focus on employment law, Mr. Schulman typically charges an hourly rate of $525.

John Luke is a senior attorney at Slater Slater Schulman LLP. He received a B.A in Political Science and English from Temple University and a J.D. from Catholic University where he was a National Moot Court member and an Academic Excellence Civil Procedure tutor. He was admitted to practice in courts of New York in 2010 and is admitted to practice in the Eastern, Northern, Southern, and Western Districts of New York. He is also admitted to practice in the Second Circuit Appellate Court. Mr. Luke has been admitted *pro hac vice* in the District Court of New Jersey and Washington, D.C. Prior to working for Slater Slater Schulman LLP he was a Staff Attorney for the United States Department of Justice and Derek Smith Law Group P.C., prior to joining Slater Slater Schulman LLP in July of 2018. His hourly rate for this matter is $450.00 per hour.

Christopher Van De Water, was a senior attorney at Slater Slater Schulman LLP until April 2018. He received a B.S. in Business Management from Cornell University in 1996, and a J.D. from Hofstra University School of Law in 1996, where he was an editor of the Labor and Employment Law Journal. He was admitted to practice in the courts of New York in 1997 and in the Southern District of New York in 2002. He has worked at the law firms Wilson Elser and Rivkin Radler, as well as for the New York State Office of the Attorney General, prior to joining Slater Slater Schulman LLP in January 2017. His hourly rate for this matter is $450.00 per hour.

Matthew P. Madzelan, was an associate at Slater Slater Schulman LLP until September 2019. I received a B.S. in Political Science from Stony Brook University in 2007 and a J.D. from Hofstra University School of Law in 2012. He was admitted to practice in the courts of New York in 2013 and in the Southern District of New York in 2015. Prior to working at Slater Slater Schulman LLP beginning in 2014, he worked for The Law Office of James D. Moran. While working at Slater Slater Schulman, Mathew focused his efforts on employment litigation, including wage and hour and discrimination matters. His hourly rate for this matter is $270.00 per hour.

Altogether there have been six current and former attorneys and multiple paralegals at Slater Slater Schulman who have worked on this matter since its 2017 inception, and the collective billing to date is in excess of $170,000.00 to date. Firm billing entries are attached hereto as Exhibit D. Given the continued accrual of time expected over the payout period through June 2021, together with the risk of default of Defendants, as well as this Court's practice of approving one-third attorneys' fees, in combination with the satisfactory results achieved for Plaintiffs, the Parties submit that a one-third fee in this matter is fair and reasonable.



## V.     Conclusion

For the foregoing reasons, counsel for all Parties respectfully submit that the Settlement Agreement is fair and reasonable, and therefore jointly request that the Court approve or so order the Settlement Agreement.

Respectfully submitted,

 /s/ Jonathan E. Schulman
Jonathan E. Schulman, Esq.

cc: Nils C. Shillito, Defendants' Counsel (by ECF)